UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

LYNNE GILL,

                                                  Plaintiff,

             v.                                                      1:10-CV-985
                                                                     (MAD/ATB)
MICHAEL J. ASTRUE,

                                                  Defendant.

_____

STEPHEN J. MASTAITIS , JR., ESQ., for the Plaintiff
SUZANNE M. HAYNES, Special Ass't U.S. Attorney, for the Commissioner

ANDREW T. BAXTER, U.S. Magistrate Judge

### REPORT-RECOMMENDATION

        This matter was referred to me for report and recommendation pursuant to 28

U.S.C. § 636(b) and Local Rule 72.3(d).  This case has proceeded in accordance with

General Order 18.

## I.      PROCEDURAL HISTORY

        Plaintiff filed a previous application for Social Security Disability Insurance

Benefits that was denied following a decision of an Administrative Law Judge (ALJ)

dated July 26, 2004.  (*See* Administrative Transcript (T.) 63).  Plaintiff alleged an

onset date of March 25, 1998, and the date last insured was December 31, 2005.  (*See*

T. 63).  The ALJ's denial was affirmed by the Appeals Council, and plaintiff did not

pursue any appeal.  (Pl.'s Mem. 2[1]).  Instead, plaintiff filed a new application for

Social Security Disability Insurance Benefits on November 5, 2004.  (T. 106–108 ).

---

[1] Plaintiff failed to number the pages in her Memorandum of Law (Dkt. 16).  For ease of
reference, the court will cite to pages as assigned by the Case Management/Electronic Case File
(CM/ECF) system.

Following a hearing before a different ALJ, in a decision dated October 24, 2006, plaintiff was found to be not disabled from July 27, 2004, through the date of the hearing.  (T. 63–70).  Plaintiff appealed the ALJ's decision, and on April 20, 2007, the Appeals Council remanded plaintiff's case for a new hearing.  (T. 75–76).

A hearing was held before a third ALJ on October 21, 2008, and in a decision dated November 17, 2008, the ALJ found that plaintiff was not under a disability from July 27, 2004[2] through December 31, 2005, the date last insured.  *Id.*  (T. 939–51).  Plaintiff appealed to the Appeals Council, which granted plaintiff's request for review on May 27, 2010.  (T. 12–15).  On July 16, 2010, after reviewing the ALJ's findings, the Appeals Council affirmed the ALJ's November 17, 2008 decision.  The Appeals Council's decision became the final decision of the Commissioner from which plaintiff now appeals.

## II.   ISSUES IN CONTENTION

The plaintiff makes the following claims:

The ALJ's Residual Functional Capacity (RFC) determination is not supported by substantial evidence. (Pl.'s Mem. 1).

This court concludes for the reasons below, that the ALJ's decision is supported by substantial evidence and recommends that the complaint be dismissed in its entirety.

---

[2] The previous ALJ decision dated July 26, 2004, found that plaintiff was not disabled based on the same impairments.  Because plaintiff failed to appeal that decision, the ALJ was precluded from considering plaintiff's disability status prior to July 27, 2004.  20 C.F.R. § 404.957(c)(1).  *See also Britton v. Astrue*, No. 5:06-CV-639, 2011 WL 2267587, at *13 (N.D.N.Y. June 7, 2011) (discussing administrative *res judicata*); *Malave v. Sullivan*, 777 F. Supp. 247, 251 (S.D.N.Y. 1991) (same); *Amato v. Bowen*, 739 F. Supp. 108, 111 (E.D.N.Y. 1990) (same).

## III.   APPLICABLE LAW

### A.   Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ."  42 U.S.C. § 1382c(a)(3)(A).  In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. sections 404.1520 and 416.920 to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.  If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience . . . .  Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the

3

residual functional capacity to perform his past work.  Finally, if the
claimant is unable to perform his past work, the [Commissioner] then
determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520,

416.920.  The plaintiff has the burden of establishing disability at the first four steps.

However, if the plaintiff establishes that his impairment prevents him from performing

his past work, the burden then shifts to the Commissioner to prove the final step.  *Id.*

### B.    Scope of Review

In reviewing a final decision of the Commissioner, a court must determine

whether the correct legal standards were applied and whether substantial evidence

supports the decision.  *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992)

(citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)).  A reviewing court may

not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards

were applied, even if the decision appears to be supported by substantial evidence.

*Johnson*, 817 F.2d at 986.  In addition, an ALJ must set forth the crucial factors

justifying his findings with sufficient specificity to allow a court to determine whether

substantial evidence supports the decision.  *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d

Cir. 1984).

A court's factual review of the Commissioner's final decision is limited to the

determination of whether there is substantial evidence in the record to support the

decision.  42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991).

"Substantial evidence has been defined as 'such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion.'"  *Williams on behalf of*

*Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (citations omitted).  It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 197 U.S. 229 (1938)); *Williams*, 859 F.2d at 258.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams*, 859 F.2d at 258. However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision.  *Id*.  *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

## IV.   MEDICAL EVIDENCE[3]

### A.   Time Period Covered by the Commissioner's Prior Decision

Plaintiff was diagnosed with carpal tunnel syndrome in both hands in 1998 and had surgery on her right wrist in April 1998 and November 1998.  (T. 185, 206–08, 230–31; *see* T. 189, 203).  Plaintiff also underwent right trigger thumb and index finger release surgery in January 1999.  (T. 203).  Occupational therapist Robert Joel Sears completed a functional capacity evaluation on March 16, 1999, concluding that plaintiff could perform light level work.  (T. 186–95).

Orthopedic surgeon Dr. Edwin Mohler examined plaintiff in January 2001 and noted that plaintiff had decreased range of motion in her shoulders and right wrist, but

---

[3] Additional relevant details from the medical evidence are discussed below in connection with the court's analysis of the issues in dispute.

5

had good grip strength and no intrinsic weakness or wasting. (T. 197–205). Dr. Michelle Antiles evaluated plaintiff in conjunction with plaintiff's initial application for Social Security benefits, and plaintiff told Dr. Antiles that she could sit and stand for up to four hours each, with breaks, could walk up to one mile, and lift up to 20 pounds. (T. 422). Plaintiff underwent arthroscopic shoulder surgery in February 2002, and afterward had minimal complaints of pain. (T. 242–44, 245–46). Dr. Kirkpatrick performed decompression of plaintiff's left ulnar nerve at the elbow in January 2003, and, in February 2003, performed surgery to repair the ulnar collateral ligament in plaintiff's right thumb. (T. 223A, 224).

Psychologist Dr. John McCloskey of Glens Falls Hospital Behavioral Health Outpatient Center evaluated plaintiff in May 2002. (T. 211). She told him that she was looking forward to camping and swimming in the summer and that she had ridden a bicycle two days before the evaluation. (T. 211). Dr. McCloskey diagnosed major depression, dysthymic disorder, panic disorder without agoraphobia, and alcohol dependence. (T. 209, 214).

### B.    Time Period Most Relevant to Final ALJ's Decision

Plaintiff was evaluated, at the Center for Vocational Rehabilitation on October 24, 2004, by Dr. Phillip Gara and physical therapist Cathy Krueger, who indicated that plaintiff could perform sedentary work and suggested vocational counseling. (T. 233–39). After plaintiff complained of hip and knee pain in November 2004, Dr. Kirkpatrick noted that X-rays revealed mild arthritis of the right hip with mild lateral spurring. (T. 241). Dr. Kirkpatrick also noted that bilateral knee x-rays were benign,

and concluded that plaintiff did not require additional treatment for the mild arthritis. (T. 241).

On December 3, 2004, ophthalmologist Dr. Timothy Braim completed a state disability functional assessment form.  Dr. Braim reported that he had monitored plaintiff for diabetic retinopathy since 1997 and that plaintiff's best corrected vision in both eyes was 20/20, as of her most recent visit in November 2004.  (T. 254–57; *see also* T. 321–34).  Dr. Robert L. Evans, plaintiff's primary care physician, dictated a medical report to the state disability determination offices on December 3, 2004, and examined plaintiff on December 7, 2004.  (T. 306–10).  Dr. Evans noted that plaintiff's diabetes was uncontrolled, plaintiff was noncompliant as to diet, smoking, and alcohol abuse.  (T. 309–10).  Plaintiff had a history of alcoholism, fibromyalgia, irritable bowel syndrome, reflux, anxiety, and depression, and Dr. Evans opined that he "[did] not see her working" or as "employable."  (T. 309–10).

Psychologist Dr. David Funari examined plaintiff on January 5, 2005, at the request of the Commissioner, and diagnosed plaintiff with recurrent major depression (moderate) and generalized anxiety disorder.  (T. 260–664).  Dr. Funari concluded that while plaintiff's insight and judgment were impaired and she would "probably have difficulty getting along with certain types of supervisors and coworkers," plaintiff was able to understand and follow simple instructions, had a good attention span and short term memory, and was able to handle complex mental processes.  (T. 263).

Plaintiff visited Caleo Counseling Services on February 4, 2005, and the licensed clinical social worker noted that plaintiff's appearance, behavior, orientation,

7

memory, and intellectual functioning were within normal limits; her self care, self direction, social functioning and economic self-sufficiency were impaired by her mental conditions; but her activities of daily living and ability to concentrate were not impaired. (T. 351–59). No medical records exist indicating plaintiff ever returned to Caleo Counseling Services.

Dr. Michael Holland examined plaintiff on February 14, 2005, at the request of the Commissioner. (T. 265–71). He noted that plaintiff had a normal station and gait, could get on and off the stretcher, heel and toe walk, perform a deep knee bend, and hop on each foot independently. (T. 266). Dr. Holland found that plaintiff had a good range of motion in her spine and all extremities, normal fine motor coordination, and despite plaintiff's complaints, normal range of motion in all joints. (T. 266).

On March 2, 2005, Dr. Ann Herrick, a state agency medical consultant, assessed that plaintiff was either "not significantly limited" or "moderately limited" in all areas of understanding and memory, sustained concentration and persistence, social interaction, and adaptation. (T. 292–93). Dr. Herrick noted that most of plaintiff's limitations were due to her physical problems, and she concluded that plaintiff could engage in work-related activities. (T. 292–93, 295).

A nerve conduction study performed on March 1, 2005, revealed evidence of sensory neuropathy in the lower extremities. (T. 300–02). Physician's assistant Sherrill Pronto noted, at a follow-up visit, that plaintiff had years of uncontrolled diabetes and noncompliance, and was now experiencing increased complications. (T. 296). Plaintiff visited Queensbury Family Health on August 9, 2005, and a physical

8

examination revealed that plaintiff could touch her toes and rotate her spine, despite her complaints of lower back pain.  (T. 362).  At a follow-up visit on September 27, 2005, the doctor noted that plaintiff stated that she did not think her alcohol use was affecting her gastrointestinal issues, but her doctor strongly advised her to stop drinking.  (T. 361).

### C.    Time Period After Date Last Insured

Notes from a routine visit to Queensbury Family Health on August 24, 2006, indicate that plaintiff did not test her blood sugar regularly, had not followed up with her endocrinologist, and was complaining of lower back pain.  (T. 381).  X-rays on August 28, 2006, revealed no acute fracture or subluxation, but did show some sclerotic changes.  (T. 527).  An MRI conducted on September 10, 2006, revealed no abnormality to explain plaintiff's complaints of pain.  (T. 532).

On September 15, 2006, Dr. Stratton completed a Medical Source Statement of Ability to Do Work-Related Activities and indicated that plaintiff should have limited exposure to temperature extremes, dust, humidity, hazards, fumes, odors, chemicals, and gases.  (T. 388).  Dr. Michelle Antiles completed a Medical Source Statement of Ability to Do Work-Related Activities on October 12, 2006, and indicated limitations based on diagnoses of fibromyalgia, left shoulder surgery and tendonitis, right index finger trigger finger, diabetic peripheral neuropathy, bilateral carpal tunnel syndrome and cubital tunnel syndrome.  (T. 418).

Dr. Sydney R. Hochman, plaintiff's chiropractor, completed a Medical Source Statement of Ability to Do Work-Related Activities on December 18, 2006, indicating

limitations based on diagnoses of polymyalgia rheumatica, median and ulnar neuropathies, chronic neck and lower back pain, insulin-dependent diabetes, and chronic right knee pain. (T. 400). Dr. Hochman completed another Physical Capacities Evaluation on October 10, 2007, stating that plaintiff had been totally disabled since January 2001. (T. 429–31).

On May 22, 2008, Dr. Alexander-Decker, plaintiff's endocrinologist, completed a Physical Capacities Evaluation, finding that plaintiff had been totally disabled since March 2007. (T. 732–34). Dr. Aaron Satloff, a non-examining medical expert in psychiatry, assessed plaintiff's mental functioning at the Commissioner's request on June 16, 2008. (T. 780–87). Dr. Satloff concluded that plaintiff had mild restriction of Activities of Daily Living, mild difficulties in Maintaining Social Functioning, moderate difficulties in Maintaining Concentration, Persistence or Pace, and found no episodes of decompensation. (T. 781)

Dr. Stratton completed a Physical Capacities Evaluation on June 24, 2008, at the request of plaintiff's attorney (T. 777–78). Plaintiff visited Dr. Stratton in 2008 and 2009, reporting pain in her hips and knee after a fall, and x-rays performed March 26, 2009 revealed early degenerative changes in both hip joints, but no fracture or focal bony lesion. (T. 810–21). An x-ray of plaintiff's knee performed on March 26, 2009 showed no fracture, focal bony lesion, or arthritic changes. (T. 815). Another Physical Capacities Evaluation was completed by Dr. Gary Poster on February 9, 2010. (T. 17–18).

## V.    TESTIMONY and NON-MEDICAL EVIDENCE

Born in 1963, plaintiff was 42 years old on the date last insured. (*See* T. 888, 948).  Plaintiff graduated from high school, and worked as a custodian for 12 years, a copy machine operator for two months, and a motel chambermaid for three months. (T. 141, 147, 890–92).  In a November 2004 function report, plaintiff reported that she showered, dressed, and cared for her personal needs on a daily basis.  (T. 150).  Plaintiff also indicated that she went outside daily, was able to drive, and walked 200 yards to the bus stop three times per week.  (T. 152, 158).  Plaintiff went camping and fishing a few times per year, and she enjoyed watching television and reading.  (T. 153).  Plaintiff socialized with her family and reported no difficulties getting along with people in authority.  (T. 153, 155).  She could manage finances, but had difficulty concentrating and following instructions on "bad day[s]."  (T. 153, 155).  Plaintiff indicated she suffered from stabbing, aching pain over her entire body, which she treated with Ultram, Flexeril, Soma, Advil, Ben Gay, a heating pad, a transcutaneous electrical nerve stimulation (TENS) unit, and chiropractic treatment.  (T. 154, 157–58; *see also* T. 881–83).

Plaintiff testified at hearings before an ALJ on August 15, 2006, (T. 864–884), and on October 21, 2008, (T. 887–935).  Plaintiff testified that she lived with her husband in a second floor apartment.  (T. 873–74, 888–89).  She testified that she has provided daycare for her grandson since April 2006, and has received payment from the county for this work.  (T. 880, 904).  Plaintiff testified that she watches her grandson by herself for about two and a half to three and a half hours per day during

the week.  (T. 904).  Occasionally, she watches him on weekends for a longer period of time.  (T. 904).

Plaintiff testified that she vacuumed, washed dishes, dusted, helped her husband with the cooking, and helped do laundry in the downstairs laundry facility.  (T. 874–75, 905–06).  Plaintiff testified that she smoked a pack of cigarettes per day, and prior to April 2006, drank six beers per day.  (T. 872).   She testified that in 2005, she tested her blood sugar and used insulin injections to stabilize it, but still experienced daily fluctuations that caused dizziness, sweating, and numbness.  (T. 896–99).  Plaintiff also testified that she suffered from irritable bowel syndrome (IBS), fibromyalgia, and depression in 2005.  (T. 900–01).

Plaintiff testified that from 2004 through 2006, she received sporadic mental health treatment at the Warrensburg Health Center, Glens Falls Behaviorial Health Center, and the Caleo Center.  (T. 913–14).  Plaintiff estimated that she could sit for half an hour, stand for up to 45 minutes, and lift up to 10 pounds.  (T. 911).

Vocational Expert (VE) Peter Manzi testified at the October 2008 hearing.  (T. 918–34).  The ALJ asked the VE to consider a hypothetical younger individual, with a high school education and the same past relevant work as plaintiff, who could perform light work, could climb, stoop, crouch, crawl, kneel or balance only occasionally, and could stand or sit for one hour before needing to change positions.  (T. 925–26).  The ALJ added that the hypothetical person would need to avoid respiratory irritants, and would be limited to simple, low-stress work, with no intensive interaction with the public and coworkers.  (T. 926).  The VE testified that such a person could perform

12

plaintiff's past relevant work as a photocopy machine operator, and could also perform the jobs of "collator operator" or "laundry sorter," which both existed in significant numbers in the national and local economies. (T. 926–27). The VE testified that if the person could only reach occasionally, he or she could not perform those jobs, but could perform the job of "investigative dealer accounts[4]" or "surveillance system monitor." (T. 928–30).

## VI.   ALJ'S DECISION

The ALJ found that plaintiff has the following "severe" impairments: diabetes mellitus, status post carpal tunnel release, status post cubital tunnel release, left shoulder surgery, asthma, depressive disorder and history of alcohol abuse. (T. 941). However, the ALJ found that none of these impairments, singly or in combination, rose to the severity of a listed impairment. (T. 942).

The ALJ then determined plaintiff's residual functional capacity, finding that plaintiff could still perform light work, with only occasional stooping, climbing, crouching, crawling, kneeling, and balancing. (T. 944). In addition, the ALJ found that plaintiff must have the option to sit or stand for one hour, and must not be exposed to high concentrations of dust, smoke, fumes, chemicals, noxious gasses, or extremes of temperature or humidity. (T. 944). The ALJ found that plaintiff is capable of performing only simple work that is at the low end of the stress continuum, avoiding intensive interaction with the public or coworkers. (T. 944). The ALJ found that plaintiff's statements as to the intensity, persistence, and limiting effects of her

---

[4] The VE testified that this job is similar to an inventory clerk. (T. 929).

pain and mental impairments were not completely credible.  (T. 944-45) .

The ALJ gave significant weight to the opinions of medical expert Dr. Satloff, consultative psychiatric evaluator Dr. Funari, and non-examining reviewing psychologist Ann Herrick, Ph.D.  (T. 947).  The ALJ noted that Dr. Satloff is a board-certified psychiatrist, and he reviewed the entirety of plaintiff's medical records for the time at issue.  (T. 947).  The ALJ found that Dr. Satloff's opinion was not contradicted by evidence of equal weight, and was supported by objective medical evidence.  (T. 947).  The ALJ found that Dr. Funari's opinion was consistent with his psychiatric evaluation of plaintiff and was not contrary to the objective evidence in the record.  (T. 947).  The ALJ found that Dr. Herrick's opinion was supported by the objective evidence in the record, as well as the opinion of the consultative examiner, Dr. Funari.  (T. 947).

The ALJ considered the opinion of treating chiropractor, Sidney Hochman, DC, but noted that while a chiropractor's opinion may be considered, a chiropractor is not considered a medical expert under the regulations.  (T. 947).  The ALJ also found that Dr. Hochman's opinion was not supported by the objective evidence in the record.  (T. 947).

The ALJ also considered and gave some weight to the opinions of functional capacity evaluators Dr. Philip Gara, M.D. and Kathy Krueger, PT.  (T. 947).  The ALJ found that the conclusions of the functional capacity evaluators were too limiting, and found that the evidence taken as a whole indicated that plaintiff could perform a wide range of light work.

14

The ALJ gave some weight to Dr. Christine Alexander Decker, plaintiff's treating physician from 2005 to the then-current date of April 11, 2008.  (T. 948).  The ALJ found that Dr. Decker's opinion that plaintiff has been disabled since March 2007 affirmatively showed that plaintiff was not under disability prior to the expiration of her date last insured.  (T. 948).[5]  The ALJ also noted that despite her history of depression going back to her childhood, plaintiff maintained employment for many years, and apparently did not display any psychiatric symptoms in the workplace.  (T. 948).

The ALJ found that given her residual functional capacity, plaintiff was unable to perform any past relevant work, and that plaintiff's limitations prevented her from performing a full range of light work.  (T. 948, 950).  The ALJ, thus, consulted a VE. (T. 950).  Based on the testimony of the VE, the ALJ concluded that plaintiff could successfully adjust to other work that existed in significant numbers in the national economy.  (T. 950).  The ALJ thus found that plaintiff was not under a disability from July 27, 2004 (the date of the prior determination that plaintiff was not disabled), through December 31, 2005 (the date last insured).  *Id.*

## VII.  ANALYSIS

Plaintiff argues that the ALJ incorrectly found that plaintiff could perform a limited range of light work, based both on medical findings and upon a rejection of any of the plaintiff's statements to the contrary.  (Pl.'s Mem. 10–23).

---

[5] The ALJ did not consider a treating source opinion from Dr. Robert Lapp Evans, from late 2004.  (T. 309–10).  On review, the Appeals Council stated that the ALJ should have considered the treating doctor's medical opinion.  However, the Appeals Council evaluated Dr. Evans' opinion and concluded that it merited little weight because it was unsupported.  (T. 9)

### A.    Residual Functional Capacity (RFC)/Treating Physician

### 1.    Applicable Law

In rendering a residual functional capacity (RFC) determination, the ALJ must consider objective medical facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations.  20 C.F.R §§ 404.1545, 416.945.  *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999) (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)).  An ALJ must specify the functions plaintiff is capable of performing, and *may not simply make conclusory statements regarding a plaintiff's capacities*.  *Martone v. Apfel*, 70 F. Supp. 2d at 150 (citing *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984); *LaPorta v. Bowen*, 737 F. Supp. at 183; *Sullivan v. Secretary of HHS*, 666 F. Supp. 456, 460 (W.D.N.Y. 1987)).  RFC can only be established when there is substantial evidence of each physical requirement listed in the regulations.  *Id.*  The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence.  *Trail v. Astrue*, 5:09-CV-1120, 2010 WL 3825629 at *6 (N.D.N.Y. Aug. 17, 2010) (citing Social Security Ruling (SSR) 96-8p, 1996 SSR LEXIS 5, 1996 WL 374184, at *7).

While a treating physician's opinion is not binding on the Commissioner, the opinion must be given controlling weight when it is well supported by medical findings and *not inconsistent with other substantial evidence*.  *See Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); 20 C.F.R. § 416.927(d).  If the treating physician's

opinion is contradicted by other substantial evidence, the ALJ is *not* required to give the opinion controlling weight. *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). The ALJ must, however, properly analyze the reasons that the report is rejected. *Id.* An ALJ may not arbitrarily substitute his own judgment for competent medical opinion. *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999).

### 2.    Analysis

In this case, the ALJ found that plaintiff could perform a limited range of light work.  Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  20 C.F.R. § 404.1567(b). The ALJ also found additional limitations, including that plaintiff could perform only occasional stooping, climbing, crouching, crawling, kneeling, and balancing; she required a sit-stand option; she could perform only simple, low-stress work, with limited interaction with the public or coworkers; and she should avoid exposure to respiratory irritants or extreme temperatures and humidity.  (T. 944).

The medical evidence from the relevant time period supports the ALJ's finding that plaintiff was capable of light work with the additional limitations.  As the ALJ noted (T. 947), the functional capacity evaluators, Dr. Philip Gara and Kathy Krueger, PT, examined plaintiff on October 25, 2004, and concluded that plaintiff could sit for four and a half to five hours per day, with changes in position every 45 minutes, could stand two to three hours per day, with changes of position every 15 minutes, and could walk three to four hours per day and could occasionally lift and carry 10 pounds and frequently lift 7 pounds.  (T. 233–34).  Dr. Gara and PT Krueger also noted that while

plaintiff reported pain along her groin, legs, hips, lower back, and upper extremities, "[p]ain behaviors were present, but there was an absence of objective signs of discomfort." (T. 233). They stated that "[plaintiff] demonstrated self-limiting behaviors *but* reports *not*[6] being very active at home and had fear of increasing discomfort." (T. 233) (emphasis added). The substance of the ALJ's opinion indicates that he gave some weight to Dr. Gara and PT Krueger's report, but found that because of the contradictory nature of plaintiff's behavior noted therein, the report's conclusion—that plaintiff could perform sedentary work—was too limiting and not fully representative of plaintiff's RFC. (*See also* T. 263, 266, 874–75).

The ALJ relied on other medical evidence which supported his conclusion that plaintiff could perform certain light work, with additional limitations. Plaintiff saw Dr. Douglas Kirkpatrick on November 23, 2004, complaining of hip pain. (T. 241). Dr. Kirkpatrick noted that plaintiff had mild pain with range of motion through the hips, but X-rays only revealed very early mild arthritis of the right hip with mild lateral spurring. (T. 241). Dr. Kirkpatrick did not see anything he thought required treatment related to her hips or knees at that time. (T. 241).

Dr. Michael Holland saw plaintiff at the Glens Falls Hospital Center for Occupational Health as part of a New York State Disability Examination on February 14, 2005. (T. 265–67). Dr. Holland noted that plaintiff had a history of fibromyalgia

---

[6] The ALJ's decision incorrectly stated that Dr. Gara and PT Krueger indicated that plaintiff reported "being very active at home." (T. 948). The substance of Dr. Gara and PT Krueger's report indicates that plaintiff reported pain, and avoided activities she thought would increase or cause pain. The court notes that other records indicate plaintiff's level of activity at home. (T. 263, 266, 874–75).

with multiple musculoskeletal complaints, but indicated that plaintiff's station and gait were normal, and she got up and down off a stretcher without difficulty. (T. 266–67). The range of motion in plaintiff's cervical spine, lumbar spine, both shoulders, both elbows, both wrists, both knees and both ankles was normal, her motor strength was 5/5, and her fine motor coordination was normal. (T. 266). Plaintiff could walk on her heels and toes, do a deep knee bend, and hop on each foot independently. (T. 266–67). X-rays taken in August 2006 revealed no acute fracture or pathologic subluxation, while mild osteophytic endplate spurring throughout the lumbar spine was noted. (T. 527). An MRI performed on September 10, 2006, revealed no abnormality or visible nerve root impingement. (T. 532). In addition, Dr. Holland noted that plaintiff had asthmatic bronchitis, but found no wheezing during a chest exam and plaintiff's spirometry was normal, despite her continued smoking.[7] (T. 267). Dr. Holland's report strongly supports the ALJ's finding that plaintiff was capable of a limited range of light work.

As discussed above, plaintiff's treating physician, Dr. Evans, opined in late 2004 that he "[did] not see her working" or as "employable." (T. 309–10). The Appeals Council appropriately found that Dr. Evans' conclusion was not properly supported by objective findings (T. 9), in that the doctor merely recited a litany of plaintiff's medical conditions, without any discussion of how they effected her ability to work.

---

[7] A breathing problem that is aggravated by plaintiff's own conduct is not disabling. *See Mongeur v. Heckler*, 722 F.2d 1033, 1039 (2d Cir. 1983).

The ALJ also discussed evidence regarding plaintiff's mental health that supported his RFC finding.  David Funari, Ph.D., conducted a consultative psychiatric examination on January 5, 2005 diagnosing plaintiff with recurrent major depression (moderate) and generalized anxiety disorder.  (T. 260).  Dr. Funari assigned a GAF[8] of 54 based on plaintiff's psychological problems and a GAF of 41 based on both psychological and physical problems.  (T. 263).  Dr. Funari noted that plaintiff's insight and judgment were impaired, and she would "probably have difficulty getting along with certain types of supervisors and coworkers."   He concluded, however that plaintiff was able to understand and follow simple instructions, had a good attention span and short term memory, and was able to handle complex mental processes.  (T. 263).

Dr. Satloff, a non-examining board-certified psychiatrist, reviewed plaintiff's medical records, answered interrogatories, and completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental) dated June 16, 2008.  (T. 780–87).  Dr. Satloff concluded that plaintiff had no limitations to understanding and remembering simple instructions, carrying out simple instructions, and making judgments on simple work-related decisions.  (T. 785).  He noted that plaintiff had mild limitations in understanding and remembering complex instructions and

---

[8] The GAF is a scale that indicates the clinician's "judgment of the individual's overall level of functioning."  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed., text revision 2000) (DSM-IV-TR).  The GAF scale ranges from 0 to 100; GAF scores from 61–70 indicate some mild symptoms or some difficulty in social, occupational, or school functioning.  A GAF of 51–60 indicates moderate symptoms or moderate difficulty in social, occupational or school functioning.  A GAF of 41–50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning.  DSM-IV-TR at 34.

moderate limitations to carrying out complex instructions and making judgments in complex work-related decisions.  (T. 785).  Dr. Satloff indicated that plaintiff had no limitations to interacting appropriately with the public, supervisors, and coworkers, and had mild limitations to responding appropriately to usual work situations and to changes in a routine work setting.  (T. 786).

Plaintiff argues that Dr. Satloff's report should be rejected due to a lack of basis for his conclusions.  (Pl.'s Br. 14).  The ALJ is entitled to rely upon the consultative physician's opinion, particularly when there is no contradictory medical evidence in the record.  *Edwards v. Astrue*, No. 5:07-CV-898, 2010 WL 3701774, at *11 (N.D.N.Y. Sept. 16, 2010) (citing *Mongeur v. Heckler*, 722 F.2d 1033, 1039 (2d Cir. 1983); *Diaz v. Shalala*, 59 F.3d 307, 313 n.5 (2d Cir. 1995)).  Dr. Satloff properly relied on Dr. Funari's report and the body of the record as the sources of evidence for his conclusions, and the ALJ gave appropriate weight to Dr. Satloff's findings.  (T. 782).

Plaintiff testified that she has never been psychiatrically hospitalized.  (T. 913). She recalled attending about four therapy sessions each from the Warrensburg Health Center and Glens Falls Behavioral Health at different times near 2004.  (T. 913–14).

Plaintiff testified that she also went for mental health treatment at the Caleo Counseling Services, again only about four times before she stopped going back.  (T. 913–14).  The records from Caleo Counseling Services indicate that plaintiff suffered from depression, and the therapist assessed a GAF of 40[9].  (T. 356–58).  However, the

---

[9] A GAF of 31–40 indicates some impairment in reality testing or communication (speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or

Caleo report dated February 4, 2005, indicate that plaintiff's appearance, behavior, orientation, memory and intellectual functioning were within normal limits.  (T. 353). Plaintiff also had no functional limitations in her daily living activities or her ability to concentrate.  (T. 354).  The record indicates that the focus of plaintiff's counseling treatment would be to "improve level of functioning," and her discharge criteria were "develop healthy coping skills," and "stabilize moods."  (T. 357).  The therapist's sole stated treatment objective was that plaintiff was to make one positive statement per session during the course of treatment.  (T. 358).  All of these observations suggests a prognosis more positive than the reported GAF score would indicate.  Based on all the other evidence in the record relating to plaintiff's mental health, the ALJ correctly accorded significant weight to Dr. Satloff's report.

Plaintiff argues that the ALJ should have given greater weight to Dr. Alexander-Decker, Dr. Stratton, Dr. Welch, and Dr. Hochman.[10]  (Pl.'s Br. 17).  Dr. Alexander-Decker completed a "degree of disability form and a "physical capacities evaluation" on May 22, 2008, and indicated that she began treating plaintiff in July 2005, and that, in her opinion, plaintiff was completely disabled as of March 2007.  (T. 732). Because Dr. Alexander-Decker's assessment of functional capacities did not apply to the relevant time period, the ALJ found that Dr. Christine Alexander-Decker's opinion that plaintiff has been disabled since March 2007 was further evidence of the ALJ's

---

school, family relations, judgment, thinking, or mood.  DSM-IV-TR at 34.

[10] Plaintiff does not mention Dr. Poster's report dated February 9, 2010.  Because the report is dated years after the date last insured, and Dr. Poster gives no other explanation for his conclusions other than "patient has diabetic neuropathy [and] peripheral vascular disease," it is entitled to little weight.

conclusion that plaintiff was not disabled prior to the expiration of her date last insured.[11]  (T. 948).  The ALJ properly gave some weight to Dr. Alexander-Decker's opinion.

Dr. Stratton completed a "physical capacities evaluation" dated June 24, 2008, to which the ALJ did not assign a particular weight.  (T. 944–48).  This report is dated over two years after the date last insured, and treatment notes dated the same day indicate that plaintiff complained of diffuse muscular tenderness, but that her grip was "4/5" and her strength in all four extremities was "4+/5."  (T. 801–02).  Clearly, Dr. Stratton's opinion did not address plaintiff's condition during the relevant time period and did not merit controlling weight.

Dr. Welch treated plaintiff from August 2, 1991, to May 11, 1995.[12]  (T. 403–16).  Dr. Todd R. Jorgenson, who also works in Dr. Welch's office, saw plaintiff on February 16, 2001.[13]  (T. 425–26).  Another doctor in Dr. Welch's office, Dr. Michelle Antiles, saw plaintiff on May 2, 2001 (T. 421–24), and again on October 12, 2006, when she filled out a "Medical Source Statement of Ability to Do Work-Related

---

[11] As to Dr. Alexander Decker's opinion that plaintiff was disabled, the ALJ is entitled to reject conclusions of disability made by other sources because it is the province of the Commissioner to make the determination of whether an individual is "totally disabled."  20 C.F.R. §§ 404.1527(e), 416.27(e); *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)).  This is true even if the individual stating his or her opinion of "total disability" is a medical doctor.  *Id.*; *See also Michels v. Astrue*, 297 F. App'x 74, 76 (2d Cir. 2008).

[12] Plaintiff argues that Dr. Welch's opinion should be given controlling weight.  (Pl.'s Br. 17).  However, it appears from the medical records that the last time Dr. Welch saw plaintiff was in May 1995, almost ten years before the relevant period of July 24, 2004–December 31, 2005.  (T. 403–16).

[13] The record indicates that Dr. Jorgenson saw plaintiff once, three years before the relevant period.  (T. 425–26).

Activities (Physical)."[14]  (T. 417–20).  Plaintiff argues that the 2006 report should be given controlling weight.  (Pl.'s Br. 17).  However, the report is dated well after the relevant period and  gives no explanation for its conclusions other than a list of diagnoses: "fibromyalgia, [left] shoulder surgery/tendonitis, [right] index finger trigger finger, diabetic peripheral neuropathy, [bilateral carpal tunnel syndrome] and cubital tunnel."  (T. 418).  The ALJ was correct in not assigning Dr. Welch's prior records or the October 12, 2006 report controlling weight.

Chiropractor Sydney R. Hochman reported that he treated plaintiff from September 1994 through October 2007, but the only record included is a letter dated October 3, 2007, indicating his conclusion that plaintiff was totally disabled as of January 2001.  (T. 429).  Dr. Hochman also completed a "Physical Capacities Evaluation" dated October 10, 2007, a fill-in-the-blank form.  (T. 430–31).  The ALJ found that Dr. Hochman, as a chiropractor, is not an acceptable medical source under the regulations, and thus not a treating source.  20 C.F.R. §§ 404.1513, 404.1502.  Therefore, his opinion was not entitled to controlling weight.  20 C.F.R. § 404.1527 (d)(2).  In addition, because Dr. Hochman did not indicate how frequently he treated plaintiff, when he last saw plaintiff, and whether the conclusions on the October 10, 2007 form were based on the relevant period, the ALJ appropriately considered Dr. Hochman's opinion, but did not grant it controlling weight.  As discussed above,

---

[14] It appears from the record that Dr. Antiles saw plaintiff twice: once in May 2001 for a Social Security evaluation and one other time, five years later, when she completed the October 12, 2006  "Medical Source Statement of Ability to Do Work-Related Activities (Physical)."  (T. 417–24).  Plaintiff attributes the October 12, 2006 form to Dr. Welch, but defendant correctly points out that Dr. Antiles actually completed the form, as the same signature is on the October 12, 2006 form and the May 2001 letter signed by Dr. Antiles.  (*See* T. 420, 424).

substantial evidence exists in the record that supports the ALJ's conclusion that plaintiff was capable of a limited range of light work.

### B.    Pain and Credibility

"An [ALJ] may properly reject [subjective complaints] after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.'" *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999) (quoting *Gallardo v. Apfel*, No. 96 CIV 9435, 1999 WL 185253, at \*5 (S.D.N.Y. March 25, 1999)).  To satisfy the substantial evidence rule, the ALJ's credibility assessment must be based on a two step analysis of pertinent evidence in the record.  *See* 20 C.F.R. § 404.1529; *see also Foster v. Callahan*, No. 96-CV-1858, 1998 WL 106231, at \*5 (N.D.N.Y. March 3, 1998).

First, the ALJ must determine, based upon the claimant's objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged. . . ."  20 C.F.R. § 404.1529(a).  Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which it limits the claimant's capacity to work. *Id.* § 404.1529(c).

When the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the

credibility of the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. *Id.* § 404.1529(c)(3).

The ALJ noted that plaintiff cares for her grandson three hours per day for five days a week, totaling 15 to 20 hours per week, which plaintiff testified she had been doing for two years prior to the October 21, 2008 hearing. (T. 945; *see* T. 912). However, plaintiff also testified that she had stopped working at her custodial job due to her pain. (T. 892–94). Plaintiff also testified that her diabetes caused her to quit her job in 1999 (T. 894), but she had been diagnosed with diabetes in 1980, and thus all her time working as a custodian was as a Type I diabetic. (T. 894).

The ALJ noted that while plaintiff saw a physician a few times for mental health treatment prior to 1999 (T. 945; *see also* T. 901–02, 913), and received a few therapy sessions at different times from the Warrensburg Health Center, Glens Falls Behavioral Health, and the Caleo Center (T. 945; *see also* T. 913–14), she has never been psychiatrically hospitalized (T. 945; *see also* T. 913), and was not on any medication for depression at the time of the October 21, 2008 hearing. (T. 901). Plaintiff testified that she quit drinking alcohol in April 2006, but drank an average of

26

five to six beers per day before then.  (T. 914).  The ALJ also noted that plaintiff testified she never had legal problems or work problems as a result of her alcohol abuse.  (T. 945; *see also* T. 914–15).

It is clear that plaintiff suffers from pain, but as the evidence discussed above indicates, her pain does not preclude plaintiff from performing a limited range of light work.  She has continually provided care for her grandson, and while she cannot do everything at home, she is capable of doing many household chores and taking care of herself.  (T. 263, 266, 874–75).  Thus, the ALJ's finding that plaintiff's statements as to the intensity, persistence, and limiting effects of her pain and mental impairments are not completely credible is supported by substantial evidence.

### C.   Vocational Expert

Because the ALJ found the plaintiff was unable to perform her previous work, the ALJ proceeded to Step 5 of the Commissioner's sequential analysis.  Step 5 requires the ALJ to determine whether the plaintiff's impairments prevent her from adjusting to a type of work different from what she has done in the past.  20 C.F.R. §404.1520(a)(v).  The burden of proof at this step shifts to the ALJ to demonstrate that there is other work in the national economy that plaintiff can perform.  *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982), 20 C.F.R. §404.1560(c)(2).  The ALJ may, under the appropriate circumstances, rely on the "Medical Vocational Guidelines," contained in 20 C.F.R. Part 404, Subpt. P, App. 2, known as "The Grids." *Zorilla v. Chater*, 915 F. Supp. 662, 667 (S.D.N.Y. 1996) (footnotes omitted).  But if plaintiff has non-exertional impairments, and if those non-exertional impairments

27

"significantly limit the range of work" permitted by her exertional impairments, the ALJ may be required to consult a vocational expert (VE).  *Bapp v. Bowen*, 802 F.2d 601, 606 (2d Cir. 1986).  In this case, the ALJ utilized a VE.

If the ALJ does use a VE, he must present the VE with a set of hypothetical facts to determine whether plaintiff retains the capacity to perform any specific job.  *See Aubeuf v. Schweiker*, 649 F.2d 107, 114 (2d Cir. 1981).  The ALJ may rely on a VE's testimony regarding the availability of work as long as the hypothetical facts the expert is asked to consider are based on substantial evidence and accurately reflect the plaintiff's limitations.  *Calabrese v. Astrue*, 358 F. App'x 274, 276 (2d Cir. 2009).  Where the hypothetical is based on an ALJ's RFC analysis which is supported by substantial facts, the hypothetical is proper.  *See id*. at 276–277.  The ALJ is not required to pose a hypothetical that includes non-severe impairments.  *See Dumas v. Schweiker*, 712 F.2d 1545, 1554 n.4 (2d Cir. 1983).  A plaintiff will be found not disabled if the ALJ determines the plaintiff can perform work that exists in the national economy regardless of whether work exists in the immediate area in which plaintiff lives, a specific job vacancy exists for plaintiff, or plaintiff would be hired if she applied.  20 C.F.R. §§ 404.1566(a)(1)–(a)(3).

In the section discussing the Medical Vocational Guidelines, the ALJ found that plaintiff's additional limitations prevented her from performing a full range of light work.  (T. 950).  Thus, the ALJ consulted a VE to testify whether jobs existed in the national economy for an individual with the plaintiff's age, education, work experience, and residual functional capacity.  (T. 950).  The VE testified that plaintiff

would have been able to perform the requirements of representative occupations such as collator operator with 185 such jobs in the region and 48,496 such jobs in the national economy; photocopy machine operator with 97 such jobs in the region and 22,418 such jobs in the national economy; and laundry sorter with 327 such jobs existing in the region and 131,274 such jobs in the national economy.[15]  (T. 926–27).

The ALJ then added the restrictions that plaintiff could only occasionally reach in all directions and could not perform a job requiring constant fingering.  (T. 928). The VE testified that plaintiff would still have been able to perform the requirements of representative occupations such as "investigator dealer accounts," with 160 such jobs in the region and 36,000 such jobs in the national economy; and "surveillance system monitor," with 88 such jobs in the region and 11,964 in the national economy. (T. 929–30).

As discussed above, the ALJ's RFC determination was supported by substantial evidence, and thus, the hypothetical the ALJ posed to the vocational expert was proper, based on the ALJ's RFC assessment.  The ALJ properly applied the correct legal standards, and his findings were supported by substantial evidence from the record.

**WHEREFORE**, based on the findings above, it is

---

[15] The numbers above are taken from the ALJ's decision.  (T. 950).  They do not match the numbers originally stated by the VE.  The numbers were recalculated by taking 88.4% of the actual numbers provided by the VE to obtain the appropriate number for the relevant time period, as explained by the VE later in his testimony.  (T. 930–31).  The VE gave the ALJ figures related to the time of the hearing, as he had not had time to calculate the numbers relating to the relevant time period.  (T. 930).  The VE instructed the ALJ that the numbers for the relevant time period could be calculated by taking 88.4% of the current figures given in his testimony.  (T. 931).  The ALJ then used these recalculated figures in his decision.  (T. 950).

**RECOMMENDED**, that the decision of the Commissioner be **AFFIRMED** and the complaint be **DISMISSED IN ITS ENTIRETY.**

Pursuant to 28 U.S.C. § 636(b)(1), the parties have 14 days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN 14 DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated:  August 29, 2011

Hon. Andrew T. Baxter
U.S. Magistrate Judge